United States Court of Appeals
Fifth Circuit

**F I L E D**

FILED-CLERK
U.S. DISTRICT COURT

2007 FEB -6 PM 5: 23

TX EASTERN-MARSHALL

BY

December 27, 2006

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

Nos. 04-41362, 04-41764, 05-40686

JAMES EDWIN HODGES; BEVERLY HODGES,
Plaintiffs-Appellees, Cross Appellants,

versus

MACK TRUCKS INC.,
Defendant-Appellant, Cross Appellee,

JAMES EDWIN HODGES; BEVERLY HODGES,
Plaintiffs-Appellants,

versus

INDIANA MILLS & MANUFACTURING INC., ET AL,
Defendants,

MACK TRUCKS INC.,
Defendant-Appellee,

JAMES EDWIN HODGES; BEVERLY HODGES,
Plaintiffs-Appellees,

versus

INDIANA MILLS & MANUFACTURING; ET AL,
Defendants,

ABF FREIGHT SYSTEM INC.,
Intervenor-Appellant.

Appeals from the United States District Court
for the Eastern District of Texas
(2:03-CV-183)

Before DAVIS, BARKSDALE, and DeMOSS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

These three appeals arise out of a product-liability, diversity action for injuries sustained because of a secondary collision in Texas, involving a tractor-trailer manufactured by Mack Trucks, Inc. (Mack). Mack seeks judgment as a matter of law and, in the alternative, a new trial, claiming, *inter alia*, the district court improperly both admitted expert testimony and excluded evidence concerning the use, or nonuse, of his seatbelt by James Hodges (Hodges), the injured driver of the truck. Hodges received a multi-million dollar verdict. He and his wife, Beverly Hodges (the Hodges), contest her not also being awarded damages and seek a new trial on that issue. Finally, ABF Freight Systems, Inc. (ABF), Hodges' employer and workers'-compensation provider, challenges the district court's rulings on its subrogation claim. A new trial and ABF's claim's being reconsidered are required. **VACATED AND REMANDED.**

I.

On 1 November 2002, a 16-year-old drove her vehicle into the path of an oncoming Mack truck, driven by Hodges, a 34-year veteran driver of large trucks. His cab was pulling two trailers, and the other vehicle hit the right front wheel of Hodges' truck, causing extensive damage. The truck swerved into the path of an oncoming car, breached a guard rail, and jack-knifed down an embankment. It

2

came to rest with the nose of the tractor pointed up; the passenger-side door was damaged but the door frame and the cab were not deformed.

Hodges was ejected through the passenger side and sustained severe and permanent injuries, including paraplegia. (It is undisputed that, had he remained in the cab, his injuries would have been far less serious.) ABF, Hodges' employer, was self-insured and began paying Hodges workers' compensation.

ABF owned the truck. Its seatbelts were manufactured by Indiana Mills & Manufacturing (Indiana Mills). Its door latches, manufactured by KSR International, were installed by Mack.

In May 2003, the Hodges filed this action against Indiana Mills and Mack, claiming a design defect in the seatbelt caused Hodges to be ejected. (The Hodges had settled with the 16-year-old driver for $50,000.) In early 2004, the Hodges added a design-defect claim for the passenger-side door latch, asserting the defect caused the latch to fail after Hodges' truck was hit. That June, ABF intervened to protect its subrogation interests in workers' compensation paid to Hodges.

Prior to trial, Mack repeatedly, and unsuccessfully, challenged some of the Hodges' proposed expert witnesses being permitted to testify. Notwithstanding the district judge's concomitant extensive involvement and knowledge about the issues, the case was reassigned approximately two weeks before trial

3

commenced on 23 August 2004. (Jury selection was during the week of 16 August.)

On 14 August, Indiana Mills settled with the Hodges on the seatbelt claim for $1.4 million. The settlement structure provided for James and Beverly Hodges to each receive half of the settlement amount. Accordingly, only the defective-door-latch issue remained for trial, with Mack as the sole defendant.

On the eve of trial, as a result of that settlement, the Hodges moved to exclude all evidence of Hodges' use, or nonuse, of his seatbelt, pursuant to § 545.413(g) of the Texas Transportation Code, claiming the statute proscribed introducing such evidence in civil trials (seatbelt evidence). The motion was granted without written reasons being given.

During trial, the Hodges introduced expert testimony by Steven Syson. He testified: the door latch failed; and there was a safer alternative design available that would have substantially reduced the likelihood of Hodges' injuries. Mack's pretrial motions to exclude this testimony had been denied.

On 26 August, following approximately two and one-half days of testimony, the jury returned its verdict, finding Mack and the 16-year-old driver 60% and 40% liable, respectively, for Hodges' injuries. It awarded $7.9 million in damages, but awarded the entire amount to Hodges. In short, the jury awarded Beverly Hodges no damages for loss of household services and consortium.

4

That September, Mack moved for judgment as a matter of law (as it had done during trial) and, in the alternative, a new trial. The Hodges moved for a new trial on Beverly Hodges' damages claim. That November, the court denied those motions, without providing written reasons.

In October, Indiana Mills had interpled its $1.4 million in settlement funds into the court's registry. As noted, under the agreed settlement terms, James and Beverly Hodges were to each receive $700,000. ABF claimed it was entitled to the entire amount, not just the $700,000 Hodges was to receive, for workers' compensation it had paid, as well as would pay in the future. That December, the district court held an evidentiary hearing on the funds' disbursement. Among other rulings, it denied ABF's request for reapportionment of the settlement amount, holding, *inter alia*, the intent of the settlement scheme was not to deprive ABF of its rights to subrogation or future credit. The funds have been disbursed.

II.

For this diversity-jurisdiction action, arising out of an accident in Texas, its substantive law applies. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). At issue is whether the district court erred in: (1) admitting Syson's expert testimony; (2) denying Mack judgment as a matter of law (JML); (3) excluding the seatbelt evidence; (4) failing to grant a new trial on Beverly

5

Hodges' damages; (5) approving the apportionment of the Indiana Mills settlement amounts between the Hodges; and (6) assessing attorney fees and litigation expenses out of ABF's subrogation recovery and calculating its right to future credit.

We hold, *inter alia*: JML was properly denied; the court reversibly erred, however, by excluding the seatbelt evidence; and, therefore, a new trial is required. Accordingly, we need *not* address Beverly Hodges' damages claim, nor fully address ABF's claims. ABF's claims are remanded to the district court for it, *inter alia*, to consider whether the effect of the settlement was to settle around ABF's subrogation lien.

A.

Mack maintains: Syson's testimony should have been excluded, pursuant to **Daubert v. Merrell Dow Pharm., Inc.**, 509 U.S. 579, 593-95 (1993); and, even if admissible, it failed, as a matter of law, to prove the requisite safer alternative design for the Mack door latch. Therefore, Mack contends judgment should be rendered in its favor. In the alternative, it seeks a new trial. (In a footnote to its opening brief, Mack also addresses the testimony of the Hodges' accident-reconstruction expert, stating it should have also been excluded under **Daubert**. It is unclear whether Mack presents this as an issue for appeal. In any event, because we reverse based on the district court's exclusion of the seatbelt evidence, it is *not* necessary to address that expert's testimony.)

6

JML is proper when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue ... ". FED. R. CIV. P. 50(a) (as amended effective 1 Dec. 2006); see also FED. R. CIV. P. 50(b) (as amended effective 1 Dec. 2006) (post-trial JML). An appellate court, in deciding whether JML should have been awarded, must first excise inadmissible evidence; such evidence "contributes nothing to a legally sufficient evidentiary basis". **Weisgram v. Marley**, 528 U.S. 440, 454 (2000) (internal quotations omitted). Therefore, we first address the contested admission of Syson's testimony. (Obviously, in deciding whether JML should be awarded Mack, the seatbelt evidence is not in play because it was excluded, not admitted. Instead, it comes into play in deciding whether, in the alternative, Mack is entitled to a new trial.)

1.

The admission of expert testimony is reviewed for an abuse of discretion. E.g., **Stolt Achievement, Ltd. v. Dredge B.E. Lindholm**, 447 F.3d 360, 366 (5th Cir. 2006). "District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." **Watkins v. Telsmith, Inc.**, 121 F.3d 984, 988 (5th Cir. 1997) (internal citations and quotations omitted; emphasis added).

**Daubert** interpreted Federal Rule of Evidence 702 (admissibility of expert testimony) and assigned the trial court a gatekeeper role to ensure such testimony is both reliable and relevant. **Daubert**, 509 U.S. at 598. In determining whether the proferred testimony is reliable, the district court must first "assess[] ... whether the reasoning or methodology underlying the testimony is scientifically valid". **Curtis v. M&S Petroleum, Inc.**, 174 F.3d 661, 668 (5th Cir. 1999). The court should "make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field". **Kumho Tire Co. v. Carmichael**, 526 U.S. 137, 152 (1999).

Rule 702 was amended in 2000, in response to the Supreme Court's decisions in **Daubert** and **Kumho Tire**. See Advisory Committee Notes on FED. R. EVID. 702 (2000 Amendments). A party seeking to introduce expert testimony must show "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case". FED. R. EVID. 702.

In analyzing the Mack latch at issue, Syson: reviewed relevant Mack cab and door designs; examined numerous patents for latches and door designs in order to provide a safer alternative

8

design; directed a third-party engineering firm to conduct force
tests on the Mack latch; and analyzed the Federal Motor Vehicle
Safety Standards (FMVSS) data published by the National Highway
Traffic Safety Administration to determine the strength of the Mack
latch as compared to an alternate design.   (In addition, he
calculated the deformation to the Mack cab door frame and its
effect on the Mack latch in order to analyze Mack's theory
concerning Hodges' injuries — that, after Hodges was outside the
cab, his body somehow opened the passenger door.   Mack abandoned
this theory during oral argument here.)

Mack challenges Syson's testimony as unreliable for a number
of reasons, including:  he is not a door-latch specialist; he was
previously found to be an unreliable expert witness by a Texas
court; he has not published any peer-reviewed articles purporting
to show the weaknesses in the Mack latch; and he did not conduct
his own tests or force calculations on the latches, but instead
relied upon third-party testing.

Of course, whether a proposed expert should be permitted to
testify is case, and fact, specific.   *Kumho Tire Co.*, 526 U.S. at
150-51.  Trial judges retain "broad latitude" both in deciding how
to determine whether an expert's testimony is reliable, and
ultimately, whether the testimony is, in fact, reliable.   *Id.* at
142.  Syson, an engineer with many years experience working in, and
testifying against, the automobile industry, presented very complex

9

and technical testimony about the Mack latch and how it failed. He opined: Hodges was injured because Mack's passenger-side door latch failed (Mack does *not* dispute the latch failed at some point); and a safer alternative design existed which would not have broken and, thus, would have prevented Hodges' injuries.

As discussed, Mack and Indiana Mills filed numerous **Daubert** motions prior to trial challenging some of the Hodges' experts. A magistrate judge held hearings on evidentiary matters and questioned counsel in detail. Mack's challenge to the magistrate judge's ruling was considered, and denied, by the district judge then assigned to the case. A month before trial, that judge denied additional **Daubert** motions concerning Syson and the Hodges' accident-reconstruction expert.

At trial, many of Mack's challenges to Syson's testimony were developed by its cross-examination of him; the judge and jury were able to determine his credibility. The trial (second) judge denied Mack's renewed request to exclude that testimony and denied Mack's two JML requests during trial based in part on that challenge. (During Syson's extensive testimony, despite Mack's numerous challenges to the bases for it, it objected *only once*. Along that line, the Hodges' counsel continuously asked Syson extremely leading questions.)

Based on our review of the record, and as reflected *infra*, it was *not* manifestly erroneous for the district court to find Syson's

10

testimony relevant and reliable. Therefore, it did *not* err in admitting it pursuant to Rule 702.

2.

As noted, Mack next contends: even if Syson's testimony was properly admitted, Mack should be awarded JML because the testimony failed to prove the existence of a safer alternative design. Mack preserved this issue by moving for JML at the close of the Hodges' evidence, at the close of all the evidence, and post-trial. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 126 S. Ct. 980, 986 (2006) (holding appellate court cannot review JML claim unless JML requested both pre- and post-trial); FED. R. CIV. P. 50 (pre-2006 Amendments); *see also* Advisory Committee Notes on FED. R. CIV. P. 50(b) (2006 Amendments). (In this regard, Mack's extremely brief and conclusory JML motion at the close of the Hodges' case was, at best, barely sufficient. To make matters worse, Mack simply "renew[ed] it on the same points" at the close of the evidence. Although we conclude *dubitante* that Mack preserved the alternate-design issue for appeal, issues presented in such a perfunctory manner run the risk of being forfeited. *See, e.g., Bridas S.A.I.P.C. v. Gov't of Turkm.*, 345 F.3d 347, 356 n.7 (5th Cir. 2003); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991), *cert. denied*, 506 U.S. 1083 (1993).)

A JML motion challenges the legal sufficiency of the evidence to support the verdict. *E.g., Ford v. Cimarron Ins. Co.*, 230 F.3d

11

828, 830 (5th Cir. 2000). Our review is *de novo*, using the same standard as the district court. *E.g., **Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.***, 182 F.3d 376 (5th Cir. 1999). In reviewing the evidence, we draw all reasonable inferences in the non-movant's favor, and "disregard all evidence favorable to the moving party that the jury is not required to believe". ***Green v. Adm'rs of the Tulane Educ. Fund***, 284 F.3d 642, 653 (5th Cir. 2002) (internal quotation omitted).

To establish a design-defect claim under Texas law, the following must be proved by a preponderance of the evidence: (1) a safer alternative design existed; and (2) the design defect caused the injury. TEX. CIV. PRAC. & REM. § 82.005. A safer alternative design is

> a product design other than the one actually used that in reasonable probability
> (1) would have prevented or significantly reduced the risk of the claimant's personal injury ... without substantially impairing the product's utility; and
> (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

*Id.* § 82.005.

A design is *not* a safer alternative if, "under other circumstances, [it would] impose an equal or greater risk of harm" than the design at issue. ***Uniroyal Goodrich Tire Co. v. Martinez***, 977 S.W.2d 328, 337 (Tex. 1998), *cert. denied*, 526 U.S. 1040

(1999); *see* **Costilla v. Crown Equip. Corp. D/B/A Crown Lift Trucks Co.**, 148 S.W.3d 736, 739 (Tex. App. 2004). Similarly, the plaintiff must show "the safety benefits from [the] proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety". **Uniroyal**, 977 S.W.2d at 337; *see also* **Smith v. Louisville Ladder Co.**, 237 F.3d 515, 520 (5th Cir. 2001) (reversing verdict where plaintiff "conceded ... he made no risk-benefit analysis, including what additional hazards" his new design would have caused).

Mack relies upon **Louisville Ladder**, which concerned whether an extension ladder's cable-hook assembly mechanism was defective. **Louisville Ladder Co.**, 237 F.3d 515. As reflected above, our court held: the plaintiff's expert's testimony was insufficient to establish a safer alternative design; and, therefore, as a matter of Texas law, the plaintiff was unable to prove the ladder was defective. **Id.** at 520. The action at hand, however, differs. In **Louisville Ladder**, the expert testified that the proposed design "was a preliminary concept" not currently in use and "not ready to [be] recommend[ed] [] to a manufacturer". **Id.** at 519. Moreover, as noted *supra*, the expert never evaluated the risk associated with the proposed design and did *not* conduct a risk-benefit analysis. **Id.** Ultimately, he was unable to opine whether the proposed alternative would have prevented the injury in question. **Id.**

13

Unlike the expert's testimony in *Louisville Ladder*, Syson's was *not* mere speculation. Instead, he described in detail the latch at issue and how, and why, the proposed alternative latch would be safer. Syson examined several hundred door-latch patents on file with the Patent and Trademark Office to determine whether suitable alternative designs existed. When he found possible alternative designs, he examined how they performed compared to the Mack latch in the FMVSS-206 test, which examines the maximum longitudinal and transverse forces a door latch will maintain before it breaks. Based on that information and an analysis of the accident, Syson calculated the maximum amount of force required before deformation of the Mack latch would break it.

Syson concluded: the door latch used by Mack was defective; and another latch, the Eberhard latch, was a safer alternative and would have prevented Hodges' injuries. Among other things, Syson noted the Eberhard latch is 25% thicker at the stress point and provides 12,000 pounds of additional holding strength compared to the Mack latch, all factors that, in his opinion, would have prevented it from breaking in the accident.

Syson also testified that, based on his review of the above-discussed FMVSS-206 tests, Mack's latch was weaker than the latches used by 75 to 80% of similar vehicles. Based on his experience working with, and designing, parts for vehicles, Syson testified it would be easy, and inexpensive, for Mack to switch to the Eberhard

14

latch.   Along that line, he noted that, at the time of the accident, the Eberhard latch existed and was used in fire trucks.

Syson also conducted the requisite risk-utility analysis.   He testified:   a driver faces a significant risk if a door opens during an accident; engineers do not, and cannot, design for one particular accident; and the Eberhard latch would not impair the door's usefulness.   In other words, part of a latch's utility is its ability to keep a door shut during a vehicle crash and using the Eberhard latch would *not* diminish the door's utility. Therefore, there was sufficient evidence for a jury to find Syson's testimony satisfied the requisite risk-utility test.

Syson provided the analysis required to allow the Hodges' to establish, by a preponderance of the evidence, that, under Texas law, a safer alternative design existed.   *See GMC v. Sanchez*, 997 S.W.2d 584, 591-92 (Tex. 1999) (holding that more than a "bald assertion" that the alternative design is safer is required). Based upon his testimony, and drawing all reasonable inferences in the non-movant's favor, the evidence was sufficient to support the verdict.   Accordingly, the district court did *not* err in denying JML to Mack.

B.

Concerning Mack's contesting the seatbelt-evidence exclusion, Texas began mandating seatbelt use in 1985.   *See* Act of 15 June 1985, 69th Leg., R.S., ch. 804, 1985 Tex. Sess. Law Serv. 6062

15

(Vernon 1985) (current version at TEX. TRANSP. CODE ANN. § 545.413 (Vernon 2006)). A person greater than 15 years of age is guilty of a traffic violation if he or she "is riding in the front seat of a passenger car while the vehicle is being operated ... and ... is not secured by a safety belt". TEX. TRANSP. CODE § 545.413(a). The statute provides defenses for failure to wear a seatbelt, including, *inter alia*, a medical reason evidenced by a doctor's note. *Id.* at § 545.413(e)(1).

Pertinent to this issue, subsection (g) of § 545.413 provided: "Use or nonuse of a safety belt is *not admissible evidence in a civil trial*, other than a proceeding under Subtitle A or B, Title 5, Family Code". *Id.* at § 545.413(g) (subsection (g)) (emphasis added). In 2003, however, the Texas legislature repealed subsection (g). *See* Acts 11 June 2003, 78th Leg., ch. 204, § 8.01, 2003 Tex. Sess. Law Serv. 863 (Vernon 2003). In doing so, the legislature specified: subsection (g) is *not* applicable to "action[s] filed on or after July 1, 2003. [But a]n action filed before July 1, 2003, is governed by the law in effect immediately before the change in law ... and that law is continued in effect for that purpose." Acts 11 June 2003, 78th Leg., ch. 204, § 23.02(c), 2003 Tex. Sess. Law Serv. 898 (Vernon 2003).

As noted, this action was filed in May 2003, a few weeks before the 1 July 2003 effective date for the repeal of subsection (g). In other words, its repeal is *not* applicable to this action.

16

Accordingly, Texas statutory law proscribed the use of seatbelt evidence.

Nevertheless, Mack contends such evidence should be admitted because this action involves a secondary, not a primary, collision. (A primary collision concerns injuries sustained in the collision with another vehicle; a secondary collision concerns enhanced injuries caused by a collision with the interior of the vehicle or with an exterior object, if ejected.) This interpretation, Mack claims, is in line with a Texas Court of Appeals decision that seatbelt evidence is admissible in secondary-collision cases. *See* *Vasquez v. Hyundai Motor Co.*, 119 S.W.3d 848 (Tex. App. 2003) (en banc).

Mack notes subsection (g) was repealed only approximately one month after the Hodges filed this action and well before they added the defective-door-latch claim. At the time of trial on that claim, according to Mack, the intent of the Texas legislature was to allow seatbelt evidence, particularly in a crashworthiness action such as this. (Crashworthiness involves a claim that a defect in the automobile caused the plaintiff's injuries, rather than the underlying accident causing them.) According to Mack, without seatbelt evidence, the jury received a distorted view of the evidence, especially in the light of the Hodges' counsel's telling the jury: Hodges was ejected from the truck solely due to

17

the defective door latch; and he did nothing to contribute to his
injuries.

In addition, Mack also claims this circuit has affirmed the
introduction of such evidence under other States' laws, despite
statutory prohibition. *Hermann v. GM Corp.*, 720 F.2d 414 (5th Cir.
1983) (Louisiana law). Finally, Mack insists it is sound public
policy to permit such evidence because federal law mandates truck
drivers' wearing seatbelts.

Noting that, when they filed this action, subsection (g) was
effective, and remained effective for all actions filed prior to 1
July 2003, the Hodges contend the district court properly excluded
the seatbelt evidence because subsection (g) and Texas case law
mandate its prohibition. They maintain: under Texas law, seatbelt
evidence is admissible only under one rare exception — where the
plaintiff makes a product-liability claim against a seatbelt
manufacturer alleging a defective restraint system and must
introduce evidence of his seatbelt use to prove causation. *See
Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 134-35
(Tex. 1994). During trial, the district court stated it had based
its eve-of-trial exclusion ruling on a similar understanding of
Texas law: it provided only "one statutory exception" to the
seatbelt-evidence prohibition; and, unless that exception was met,
neither side could offer Hodges' use or nonuse of his seatbelt.

18

In addition, the Hodges claim: had the district court allowed seatbelt evidence, they would have offered "substantial evidence" that Hodges was belted at the time of the accident.    In that regard, prior to settlement of the seatbelt claim, they contended the seatbelt was defective because it became *unlatched during* the accident.

The Hodges also insist Mack did not make the required proffer of its seatbelt evidence after it was excluded.    *See* FED. R. EVID. 103(a)(2).    Mack did, however, do so at trial: an investigating officer at the scene of the accident would have testified that Hodges was *not* wearing his seatbelt at the time of the accident.

For their final response, the Hodges dispute, on two bases, Mack's claim that subsection (g) is *not* applicable for secondary-collision actions.    First, the statute's plain language does *not* support such an interpretation.    Second, the statement in *Vasquez* that such evidence was never intended to be excluded for secondary collisions is *dicta*, found in a footnote no less.

Evidentiary rulings are reviewed for an abuse of discretion. *E.g., United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1405 (2006); *see* FED. R. EVID. 103.    A trial court "abuses its discretion if, *inter alia*, it bases its decision on an error of law".    *United States v. Smith*, 417 F.3d 483, 486-87 (5th Cir.), *cert. denied*, 126 S. Ct. 713 (2005).    "If this court finds an abuse of discretion in admitting or excluding

19

evidence, this court will review the error under the harmless error doctrine, affirming the judgment, unless the ruling affected substantial rights of the complaining party." ***Ragsdale,*** 426 F.3d at 774-75 (internal citation and quotation marks omitted); *see* FED. R. EVID. 103(a).

Subsection (g) is substantive, rather than procedural. *See, e.g.,* ***Milbrand v. DaimlerChrysler Corp.,*** 105 F.Supp.2d 601, 604 (E.D. Tex. 2000) (§ 545.413(g) is a substantive law because it falls under the Texas Transportation Code and is part of the same section mandating seatbelt use). Accordingly, we apply Texas law in interpreting it. In doing so, we first determine whether it is clear and unambiguous. *See* ***Glyn-Jones***, 878 S.W.2d at 133. If it is unclear, we determine "whether ... any final decisions of the [Texas] Supreme Court are dispositive". ***Centennial Ins. Co. v. Ryder Truck Rental, Inc.,*** 149 F.3d 378, 382 (5th Cir. 1998). If no final disposition is directly on point, we must make an "***Erie***-guess", predicting how that court would rule. ***Id.***; *see also* ***Am. Guar. & Liab. Ins. Co. v. 1906 Co.,*** 129 F.3d 802, 807 (5th Cir. 1997). We make our forecast based on

> (1) decisions of the [Texas] Supreme Court in analogous cases, (2) the rationales and analyses underlying [Texas] Supreme Court decisions on related issues, (3) dicta by the [Texas] Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which [Texas] courts look when formulating substantive law and (7) other

> available sources, such as treatises and legal
> commentaries.

***Centennial Ins. Co.***, 149 F.3d at 382.

Texas law mandates drivers wear a seat belt. The statute "was enacted to mandate the use of seat belts and to provide a criminal penalty for the failure to wear [one]". ***Glyn-Jones***, 878 S.W.2d at 134. The use, or nonuse, of a seatbelt's *not being* allowed in evidence in a civil trial was "to make clear that the sole legal sanction for the failure to wear a seatbelt [was] the criminal penalty provided by the statute and that the failure could not be used against the injured person in a civil trial". ***Id.*** As discussed *infra*, however, the Texas Supreme Court noted in ***Glyn-Jones:*** when viewed in the context of the entire statute, there is "ambiguity about the legislature's purpose"; this is because the seatbelt-evidence prohibition for civil trials falls within the criminal penalties of the Texas Transportation Code, *see* ***id.*** at 133-34, an unlikely place for a provision that has been read to have such an expansive scope.

In the light of that ambiguity, we look to Texas Supreme Court decisions in analogous cases to determine the admissibility of seatbelt evidence. In ***Pool v. Ford Motor Co.,*** 715 S.W.2d 629 (Tex. 1986), the Texas Supreme Court first addressed the admissibility of seatbelt evidence under subsection (g). Pool claimed a defective U-bolt in his automobile's suspension system failed, causing an

accident. Ford maintained Pool was *contributorily negligent* for
not wearing his seatbelt. The court held: as a matter of law,
plaintiffs "should not have the damages awarded to them reduced or
mitigated because of their failure to wear available seat belts".
*Id.* at 633 (internal citations and quotations omitted). It noted
that the enactment of subsection (g) was a ratification of a prior
Texas Supreme Court decision, *Carnation Co. v. Wong*, 516 S.W.2d 116
(Tex. 1974), and held: "[F]ailure to wear a seat belt is not any
evidence of *contributory negligence*". *Id.* (emphasis added).

In 1994, however, in *Glyn-Jones*, the Texas Supreme Court
created an exception to the strictures of subsection (g). Glyn-
Jones claimed her seatbelt and shoulder harness had been
defectively designed and/or manufactured. 878 S.W.2d at 133. A
motion for summary judgement against the claim was based on the
assertion that, under subsection (g), Glyn-Jones could *not*
introduce evidence she was wearing her seatbelt at the time of the
accident. Under this theory, however, as a matter of law, the
claimant could *not* prove the essential element of causation. The
trial court granted summary judgment. *Id.* at 134.

In the intermediate appellate court, Glyn-Jones "contend[ed]
that the prohibition against the use of seat belt evidence [did]
not apply to products liability cases involving the *crashworthiness*
of an automobile. Alternatively, she argue[d] that the statute
violate[d] the open courts provision of the Texas Constitution."

22

*Glyn-Jones v. Bridgestone/Firestone, Inc.,* 857 S.W.2d 640, 642 (Tex. App. 1993) (emphasis added). As had the trial court, the intermediate appellate court, held subsection (g) proscribed admission of such evidence. *Id.* It did so on concluding subsection (g) is unambiguous and "does not differentiate between negligence actions and products liability cases". *Id.*

On the other hand, relief was granted under the open-courts provision of the Texas Constitution because subsection (g) "is arbitrary and unreasonable insofar as it prohibits the introduction of seat belt evidence in a *crashworthiness* case". *Id.* at 643-644 (emphasis added). Earlier, the court noted: Crashworthiness has been a recognized cause of action in Texas since" it was adopted by the Texas Supreme Court in 1979. *Id.* at 643. Moreover, subsection (g) "unreasonably denie[d] Glyn-Jones ... redress for [her] injuries". *Id* at 644. Therefore, subsection (g) "violate[d] the open courts provision of the Texas Constitution". *Id.*

The Texas Supreme Court affirmed the intermediate appellate court, but did so on a statutory, *not* the *constitutional*, basis. In beginning its analysis, it stated: "We must initially determine whether [subsection (g)] actually precludes Glyn-Jones from offering evidence that she used her seat belt in this case. Because we conclude that the legislature did *not* intend to bar use of such evidence, *we need not reach* the posed constitutional question". *Glyn-Jones*, 878 S.W.2d at 133 (emphasis added).

23

In construing subsection (g), the court stated it could *not* apply the usual rules of construction just to that subsection but instead had to view it in the light of the entire statute. *Id.* It then stated: "While the context normally provides clarity ... here it creates ambiguity about the legislature's purpose". *Id.* Therefore, it ruled it had to look beyond the language in the statute "to even determine the *true* purpose of the provision". *Id.* (emphasis in original).

Concerning subsection (g)'s proscription against seatbelt evidence, the court stated the *defendant*

> contends this sentence was intended to abolish *crashworthiness actions* against manufacturers of seatbelts. If the legislature did so intend, it seems unlikely that it would utilize a subsection of a traffic statute to effect such a change. Instead, read in the context of the entire statute, we hold that the legislature did *not* intend [subsection (g)] to preclude evidence necessary to a cause of action against a seat belt manufacturer for injuries allegedly caused by a defective seatbelt.

*Id.* at 134 (emphasis added). As it had in **Pool**, the court further stated that subsection (g) was *not* intended "to forge new ground in tort law, but merely to preserve the status quo [under **Carnation**]". *Id.* That status quo, pursuant to **Carnation**, was a defendant's not being "permitted to introduce evidence of a plaintiff's failure to wear a seat belt as evidence of *contributory negligence*". *Id.* (emphasis added).

24

The dissent at 2 asserts "the Texas Supreme Court ... had an excellent opportunity" in **Glyn-Jones** to adopt the "broad crashworthiness exception" urged by Glyn-Jones in the intermediate appellate court for such cases, but declined to do so. This assertion overlooks the proper, narrow basis on which the Texas Supreme Court decided **Glyn-Jones**. First, in deciding the case by construing the statute, it was able to avoid the more broad, open-courts constitutional basis on which the intermediate appellate court decided the case. The Texas Supreme Court followed the longstanding, prudential rule of not deciding constitutional issues when the case can be resolved on another basis.

It was that open-courts constitutional basis, properly avoided by the Texas Supreme Court, that involved the crashworthiness doctrine that was well-settled law in Texas. And, in construing the statute, the Texas Supreme Court properly limited its holding to the case before it — a *plaintiff's* right to introduce seatbelt evidence in a product-liability action against the seatbelt manufacturer.

The Texas Supreme Court's narrow holding in **Glyn-Jones** supports subsection (g)'s proscription *not* precluding the introduction of seatbelt evidence in the case at hand by Mack, the defendant. The Texas Supreme Court held the proscription did *not* bar all use of such evidence. On the other hand, contrary to the dissent's analysis, the Texas Supreme Court's opinion can *not* be

25

read as holding — or even suggesting — such evidence cannot be
introduced by a defendant, such as Mack.

In 2003, *Vasquez* reiterated the holding in *Glyn-Jones* that
subsection (g) was intended to preserve the status quo concerning
failure to wear a seatbelt *not* being contributory negligence. In
*Vasquez,* the parents of a child killed by a deploying air bag in an
automobile accident pursued a product-liability action against the
manufacturer on a *crashworthiness* theory. *See Vasquez*, 119 S.W.3d
at 850. Although the Texas Court of Appeals, *en banc*, decided the
case on other grounds, and therefore did *not* reach whether seatbelt
evidence should be allowed in civil trials, it nonetheless noted:
the statute was never intended to exclude evidence of seatbelt use
in "secondary collision" cases; as in *Vasquez*, where the
functionality of the passenger's passive restraint system (which
included the seatbelt) is at issue, seatbelt evidence is relevant
to proving causation and the ultimate effectiveness of the
restraint system; and the manufacturer's interest in offering
seatbelt evidence was *not to mitigate* the "product defendant's
liability for damages, but [was] offered ... to support [its]
defense that the air bag, in conjunction with seatbelt use, was *not*
defective as designed". *Id.* at 850, n.2. (emphasis added).

26

In discussing the above *dicta* in **Vasquez**, the dissent at 2 states the seatbelt evidence in that case, *which would have been offered by the defendant*, was

> arguably ... admissible under the Texas
> Supreme Court's exception in **Glyn-Jones**
> because the plaintiff alleged that the air bag
> component of the restraint system was
> defective. The defendant argued that the air
> bag, when used with a seatbelt, was not
> defective. So whether the seatbelt was in use
> was certainly closely related to the
> plaintiff's suit against the manufacturer of
> the restraint system and even more relevant to
> the air bag manufacturer's defense.

Simply put, this concession that seatbelt evidence would be "arguably admissible" in **Vasquez** demonstrates why it is admissible here.

Just as the seatbelt and air bag were part of the restraint system in **Vasquez**, so are a seatbelt and door latch each part of the restraint system here. As noted, it is undisputed that, had Hodges remained in the cab, his injuries, if any, would have been far less severe. The seat belt and door latch are each part of the system for keeping a driver in the truck's cab in an accident.

In sum, **Pool** and **Glyn-Jones**, together with **Vasquez**, are instructive. Subsection (g) prohibits the introduction of seatbelt evidence to show the plaintiff was *contributorily negligent*. On the other hand, in secondary—collision product-liability actions, such evidence may be admissible to show, or, as in this action, rebut, the essential element of causation. Seatbelt evidence was

27

necessary for Mack to rebut the essential element of causation — whether its door latch was the proximate cause of Hodges' injuries — and, ultimately, to defeat a crashworthiness claim. Such evidence is *not* prohibited by subsection (g). Arguably, this is also demonstrated by the repeal of subsection (g), even though that subsection applies here.

Therefore, the district court abused its discretion when it categorically excluded seatbelt evidence. Needless to say, this error was *not* harmless. Therefore, a new trial is required.

C.

On several bases, ABF challenges the district court's disbursement of the settlement funds from Indiana Mills (the seatbelt manufacturer). As noted, ABF, Hodges' employer, is a certified self-insured under Texas' workers'-compensation laws. It began paying such benefits to Hodges after the accident and intervened in this action to protect its subrogation rights. At the time it intervened, it had already paid Hodges over \$500,000 in benefits.

Post-trial, in November 2004, ABF moved for disbursement of the \$1.4 million settlement. That December, it moved for an evidentiary hearing regarding its workers'-compensation lien, attorney's fees and expenses, and credit and offset against future benefits. The hearing was held on 21 December. By order the next day, without providing its reasons for doing so, the court

28

disbursed the settlement funds in the following amounts: ABF received $187,709.67; James Hodges, $512,290.33; and Beverly Hodges, $700,000.

1.

Texas law provides: "The net amount recovered by a claimant in a third-party action shall be used to reimburse the insurance carrier for benefits .... that have been paid for the compensable injury". TEX. LAB. CODE ANN. § 417.002(a). According to the pretrial settlement agreement between the Hodges and Indiana Mills, $ 1.4 million was to be distributed equally between James and Beverly Hodges. ABF claims that apportionment scheme improperly reduced its reimbursement, pursuant to § 417.002(a), for past benefits paid to Hodges.

"[T]he proper division of a settlement between beneficiaries and non-beneficiaries presents an issue for the trier of fact based on the relative merits and worth of the claims involved." **United States Fire Ins. Co. v. Hernandez**, 918 S.W.2d 576, 579 (Tex. App. 1996). Because the district court was the trier of fact in apportioning the settlement, we review for clear error. FED. R. CIV. P. 52(a).

Well-settled Texas law provides: a "workers' compensation carrier has a statutory right to reimbursement from the first monies paid to an injured employee ... by a third-party tortfeasor, up to the amount of compensation paid, and can recover the amount

29

from the employee or the third-party tortfeasor". **Hernandez**, 918 S.W.2d at 578 (citing TEX. LAB. CODE ANN. §§ 417.001, 417.002); **Argonaut Ins. Co. v. Baker**, 87 S.W.3d 526, 530 (Tex. 2002). An injured employee does *not* have any right to receive payment from that tortfeasor until the carrier has been paid in full. **Tex. Workers' Comp. Ins. Fund v. Travis**, 912 S.W.2d 895, 897-98 (Tex. App. 1995). The carrier only has rights, however, "over that portion of an award or settlement which represents ... a workers' compensation beneficiary['s interest]". **Hernandez**, 918 S.W.2d at 579.

It is also well settled that "[t]he carrier's right to reduce its liability from a payment of a third-party must *not* be compromised". *Id.* at 578 (emphasis added). A trial court cannot arbitrarily compromise this right by structuring the settlement "so that a non-beneficiary recovers, but a beneficiary does not". *Id.* at 579.

Accordingly, at issue is whether the allocation of half of the Indiana Mills settlement to Beverly Hodges, a non-beneficiary, improperly compromised ABF's subrogation rights. ABF contends: at the evidentiary hearing, the district court erroneously imposed on it the burden to show the settlement was an attempt to "settle around" ABF's lien; and, because, unlike her husband, the jury found Beverly Hodges was *not* entitled to *any* damages, it was error

30

to approve a settlement scheme awarding her $700,000. The Hodges
respond: the court correctly found the settlement was *not* an
attempt to settle around ABF's lien; and Beverly Hodges' award of
$700,000 from the settlement was fair and reasonable.

Our review of the 21 December evidentiary-hearing record
reveals the district court did place an improper burden on ABF to
prove that, at settlement, the Hodges and Indiana Mills *intended* to
structure it to circumvent ABF's lien. The court began the hearing
by stating: "I'm more interested in [whether] the settlement
agreements between the [Hodges and Indiana Mills were] an attempt
to settle around [ABF's] worker's compensation carrier's lien". It
then asked ABF: "What proof do you have that at the time that
settlement was made[, it] was an attempt to settle around [ABF's]
lien?" When ABF responded that the court should look to the *effect*
of the apportionment, rather than the parties' *intent*, the court
replied:

> But, I'm trying to get at what you would tell
> me that I can hang my hat on as a Judge to say
> that I find as a fact, that the settlement
> agreement at the time [it was] entered into
> ... was *an attempt to settle around a worker's
> compensation lien*, and [to] deny [ABF its]
> rights to [its] full recovery of [its] lien?

(Emphasis added.)

The court's inquiries regarding intent were misdirected.
Under Texas law, the *effect of the apportionment*, not the settling
*parties' intent* at the time of settlement, is the controlling

31

factor when determining whether the settlement compromised ABF's lien. *Hernandez*, 918 S.W.2d at 579 ("[A settlement] is not binding upon the carrier for purposes of recovery of its subrogation interest, *regardless of the settling parties' intent*, if the *effect of the apportionment* is to circumvent the statute and to compromise the carrier's right to subrogation." (emphasis added)); *Travis*, 912 S.W.2d at 898 ("It is *not the intent of the apportionment*, but the *effect of the apportionment*, that is the determining factor." (emphasis added)).

Accordingly, on remand, the district court is to reconsider the reasonableness and fairness of Beverly Hodges' apportionment amount by examining whether the *effect* of the settlement agreement compromises ABF's lien. This remand makes it unnecessary to consider any of ABF's remaining contentions on this appointment-of-settlement point, including its assertion, for which it cites *no* authority, that the verdict should control that apportionment.

2.

ABF also claims the district court erred in: (1) awarding the Hodges' counsel attorney's fees out of ABF's subrogation recovery; (2) calculating the amount of litigation expenses to be deducted from that recovery; and (3) calculating ABF's right to future credit. Such rulings are reviewed for an abuse of discretion. *See Hartford Accident & Indem. Co. v. Buckland*, 882 S.W.2d 440, 447 (Tex. App. 1994).

32

a.

As a certified self-insurer, ABF is an "[i]nsurance carrier" (carrier) under the Texas workers' compensation laws. TEX. LAB. CODE ANN § 401.011(27)(B) (defining "carrier" to include "a certified self-insurer for workers' compensation insurance"). Section 417.003 of the Texas Labor Code provides for attorney's fees for representation of a carrier's interest in a third-party action. The district court awarded Hodges' counsel attorney's fees under subsection (a) of that statute, which states:

> An insurance carrier whose interest is *not actively represented by an attorney in a third-party action* shall pay a fee to an attorney representing the claimant in the amount agreed on between the attorney and the insurance carrier. In the absence of an agreement, the court shall award to the attorney payable out of the insurance carrier's recovery:
>
>> (1) a reasonable fee for recovery of the insurance carrier's interest that *may not exceed one-third* of the insurance carrier's recovery; and
>
>> (2) a proportionate share of expenses.

TEX. LAB. CODE ANN. § 417.003(a) (emphasis added).

To determine whether Hodges' counsel is due such fees, we must first decide whether ABF actively represented its own interest in obtaining recovery from Mack and Indiana Mills. (ABF claims it should have been awarded attorney's fees pursuant to § 417.003(c) (awarding attorney's fees where carrier is actively represented).

33

In short, the applicability of subsection (c) versus subsection (a) turns on whether ABF actively represented its own interests.) An attorney engages in active representation in a third-party action by "tak[ing] steps, adequate when measured by the difficulty of the case, toward prosecuting the claim". **Buckland**, 882 S.W.2d at 447. Active representation requires more than filing pleadings asserting the carrier's subrogation interest. See **Hartford Ins. Co. v. Branton & Mendelsohn, Inc.**, 670 S.W.2d 699, 702 (Tex. App. 1984).

**Buckland** affirmed the trial court's finding the carrier's counsel did *not* "actively represent" its interest. **Buckland**, 882 S.W.2d at 447. The court noted the carrier filed only four papers – "its plea in intervention, its amended plea in intervention, its motion for summary judgment, and its motion for reconsideration and motion for summary judgment seeking declaratory relief". **Id.** Although the carrier's counsel reviewed the claimant's compensation file and provided a summary of his medical bills, it "did not generate or send any written discovery or take any depositions in the case". **Id.** Furthermore, counsel did not: participate in the hearings; assist in hiring experts; or share in any of the litigation expenses. **Id.** Accordingly, the court held the trial court abused its discretion in awarding the claimant's attorney one-third of the carrier's subrogation recovery. **Id.**

34

On the other hand, **Brandon v. Am. Sterilizer Co.**, 880 S.W.2d 488, 496 (Tex. App. 1994), affirmed the trial court's finding the carrier "actively participated" in obtaining its recovery. There, its counsel played an active role by, *inter alia*:   attending depositions and responding to time-consuming discovery requests; arranging for evidence to be examined by various experts; and ultimately reaching a settlement agreement before trial with the defendant as to its subrogation claim. **Id.** ("[T]he controlling factor is not who aided in [plaintiff's] recovery, but rather who aided in [the carrier's] recovery.").

ABF claims it actively represented its own interest in recovery by filing: a motion to intervene and brief in support, pretrial disclosures, a complaint in intervention, and various other motions and papers. Although it admits the Hodges' counsel took the lead in negotiating the settlement with Indiana Mills, ABF points to its participation in two prior mediations, which it contends ultimately culminated in the settlement. Finally, ABF claims to have participated at trial by establishing the amount of workers'-compensation benefits Hodges had received from ABF.

ABF did *not* intervene in this action until 15 June 2004, over one year after it was filed and by which point a large portion of the discovery had been completed and the 18 May 2004 **Daubert** hearing had been held and ruled upon. ABF's participation was limited primarily to filing motions and briefs to protect its

35

subrogation interest. Although it claims to have established at trial the amount of workers'-compensation benefits it had paid, the record is void of *any* participation by ABF at trial. Rather, the amount of ABF's lien had been stipulated before trial. Finally, ABF does *not* claim to have been present when the settlement agreement between the Hodges and Indiana Mills was reached.

"By enacting section 417.003, the legislature intended to compensate claimants who perform work for the benefit of a subrogated insurance carrier and to prohibit the worker's compensation carrier from obtaining a 'free ride' from the efforts of the claimant's attorney." *Caesar v. Bohacek*, 176 S.W.3d 282, 285 (Tex. App. 2004) (internal citation omitted). ABF benefitted from the efforts of the Hodges' counsel. Therefore, the court did *not* abuse its discretion in proceeding under § 417.003(a). Likewise, it was *not* an abuse of discretion to charge ABF one-third of those fees, as authorized by § 417.003(a). *See* **Branton &** **Mendelsohn, Inc.**, 670 S.W.2d at 704 (stating that, when determining the amount of attorney's fees owed by the insurer, the court "should take into account the *benefit to the insurer*" (emphasis added)).

b.

Pursuant to § 417.003(a), ABF also claims the district court erred in calculating the amount of litigation expenses to be deducted from its subrogation recovery. TEX. LAB. CODE ANN. §

36

417.003(a)(2) (authorizing a court to award "out of the insurance carrier's recovery ... a proportionate share of expenses"). In calculating ABF's proportionate share of expenses, the court determined Hodges' total recovery was the pretrial settlement amount of $750,000, which reflects his settlements with Indiana Mills and the 16-year-old driver. For that calculation, the district court did *not* include the jury verdict for Hodges. Under the district court's calculations, ABF's lien of $577,213.83 (for its compensation payments to Hodges) comprised 76% of the total $750,000 settlement amount; and, on that basis, ABF's pro-rata share of the litigation expenses was 76%.

ABF contends: had the court instead considered both the settlement and the judgement against Mack, its proportional share of litigation expenses would be much lower. Restated, ABF claims the judgment against Mack should have been considered, along with the pretrial settlement of $750,000. On that basis, it asserts its lien of $577,213.83 would have comprised only a small percentage of the *total* amount Hodges was to have recovered (prior to our vacating the judgment).

On remand, when determining the *total* amount recovered by Hodges for use in calculating ABF's pro-rata share of Hodges' litigation costs, the district court should consider any verdict. For example, a substantial part of the Hodges' litigation expenses, which at the date of the Indiana Mills settlement totaled

37

$372,220.37, were expended not only in reaching a settlement with Indiana Mills, but also in obtaining the now-vacated multi-million dollar verdict against Mack. Indeed, Hodges' counsel testified at the 21 December ABF subrogation-claim evidentiary hearing that it was impossible to separate the litigation expenses between the claims against Mack and those against Indiana Mills, because "many of the same experts work[ed] on both defects".

Therefore, following the new trial, the district court is to consider *both* the total pretrial settlement amount it determines on remand is due Hodges and any verdict in determining ABF's pro-rata share of litigation expenses. In doing so, it is to state its underlying reasons for that ruling.

C.

Finally, ABF contends the district court erred in calculating its right to a future credit. As discussed, "[t]he net amount recovered by a claimant in a third-party action shall be used to reimburse the insurance carrier for benefits, including medical benefits, that have been paid for the compensable injury". TEX. LAB. CODE ANN. § 417.002(a). Subsection (b) provides: "Any amount recovered that exceeds the amount of reimbursement required [by § 417.002(a)] shall be treated as an advance against future benefits" (future credit). *Id.* § 417.002(b).

The $1.4 million settlement, when combined with the verdict, awarded benefits in excess of ABF's subrogation lien at the time of

38

trial. ABF contests the district court's calculation of credits, pursuant to § 417.002(b), against future benefits it owes Hodges. Needless to say, because we remand for new proceedings, we need not decide this issue. On remand, for any future-credit allocation, the district court is to state its underlying reasons for that determination.

III.

For the foregoing reasons, the judgment as to Mack and the order as to ABF's subrogation amount are **VACATED** and this matter is **REMANDED** for a new trial and other proceedings, all consistent with this opinion.

*VACATED AND REMANDED*

39

W. EUGENE DAVIS, Dissenting

I agree with the resolution of all the issues in the majority's well-written opinion except for its treatment of the seat belt issue.

I start with the plain language of the Texas statute: "Use or non-use of a safety belt is not admissible evidence in a civil trial . . ." Tex. Transp. Code § 545.413(g). When we look to Texas Supreme Court case law for exceptions to this broad rule, we find only one narrowly drawn exception in a case brought by an occupant of a vehicle against a seat belt manufacturer. The seat belt manufacturer sought to exclude evidence proffered by the plaintiff that she had her seat belt on. The Texas Supreme Court held that: "the legislature did not intend section 107C(j) to preclude evidence necessary to a cause of action against a seat belt manufacturer for injuries allegedly caused by a defective seat belt." Bridgestone/Firestone, Inc. v. Glyn-Jones, 878 S.W.2d 132, 134 (Tex. 1994). When this case was before the Texas Court of Intermediate Appeals, the plaintiff, Glyn-Jones, argued that an exception should be made to the statute for crash-worthiness cases and the court declined to adopt this broad exception. Glyn-Jones v. Bridgestone/Firestone, Inc., 857 S.W.2d 640, 642 (Tex. Ct. App. 1993). The Texas Supreme Court also declined to adopt this broad exception. As a practical matter,

40

in crash-worthiness cases where an injured occupant of a vehicle sues various manufacturers of component parts of the vehicle, the exception to the statute created by the majority would allow the evidence to be admitted in almost all crash-worthiness cases because causation is invariably at issue. If the Texas Supreme Court wanted to create such a broad exception, it had an excellent opportunity to do so and declined the invitation.

Support for the exception to the non-admissibility of use or non use of a seatbelt the majority creates rests entirely on dicta in a footnote in a single intermediate Texas Court of Appeals decision, Vasquez v. Hyundai Motor Co., 119 S.W.3d 848, 851 n. 2 (Tex. Ct. App. 2003). For a number of reasons this is a slender reed to support an exception to an exceedingly clear statute. First, the Vasquez court expressly declined to reach the admissibility of the seat belt evidence. Also, arguably, the evidence was admissible under the Texas Supreme Court's exception in Glyn-Jones because the plaintiff alleged that the air bag component of the restraint system was defective. The defendant argued that the air bag, when used with a seatbelt, was not defective. So whether the seatbelt was in use was certainly closely related to the plaintiff's suit against the manufacturer of the restraint system and even more relevant to the air bag manufacturer's defense.

In short, the passing reference in the Vasquez decision is not enough for me to avoid the plain language of the statute. I see nothing about the dicta in this factually dissimilar case or its reasoning that suggests that the Texas Supreme Court would create such a broad exception, particularly since the Supreme Court declined to do so when it had the opportunity.

For these reasons I respectfully dissent from the grant of a new trial.